Filed 9/28/20  P. v. Bennett CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>HOPETON GEORGE BENNETT,<br><br>     Defendant and Appellant. | D076355<br><br><br><br>(Super. Ct. No. SCD276665) |


APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Hopeton George Bennett of assault with a deadly weapon and making a criminal threat in violation of Penal Code sections 245, subdivision (a)(1), and 422, respectively.[1]  The jury further found that Bennett personally used a dangerous or deadly weapon within the meaning of section 1192.7, subdivision (c)(23), as to the assault charge, and within the meaning of section 12022, subdivision (b)(1), as to the criminal threat charge.

On appeal, Bennett seeks a reversal of the judgment, asserting errors related to:  (1) the court's exclusion of impeachment evidence for a percipient witness; (2) the court's exclusion of evidence that the victim previously stated that the incident was 60 percent his fault; (3) the sufficiency of the evidence to support the conviction for making a criminal threat (§ 422); (4) the sufficiency of the evidence to support the related finding that he used a dangerous or deadly weapon during the commission of the criminal threat (§ 12022, subd. (b)(1)); (5) the court's failure to instruct the jury, sua sponte, on the lesser included offense of attempting to make a criminal threat; and (6) the cumulative errors. As we explain, Bennett did not meet his burden of establishing reversible error, and on that basis we will affirm the judgment.

## I.  PROCEDURAL BACKGROUND

The district attorney issued an amended two-count information, alleging that Bennett committed crimes against D.M. on April 30, 2018. Count one charged Bennett with assault with a deadly weapon in violation of section 245, subdivision (a)(1), and further alleged that Bennett personally used a dangerous and deadly weapon, i.e., a rock, within the meaning of section 1192.7, subdivision (c)(23).  Count two charged Bennett with making

---

[1]    Further undesignated statutory references are to the Penal Code.

a criminal threat in violation of section 422 and further alleged that Bennett personally used a deadly and dangerous weapon, i.e., a rock, within the meaning of section 12022, subdivision (b)(1).

The trial commenced on April 16 and concluded on April 22, 2019. The jury convicted Bennett on both counts and found true the allegation in both counts that Bennett personally used a dangerous and deadly weapon, i.e., a rock. The jury specially found that Bennett threatened D.M. by stating, " 'I'm going to kill you.' "

The trial court sentenced Bennett to three years of formal probation and 365 days in custody, awarding specified credits. The court also imposed various fines, fees, and assessments.

Bennett timely appealed.

## II. FACTUAL BACKGROUND[2]

On April 30, 2018, before noon, there were two separate incidents involving verbal and physical confrontations between Bennett and D.M. that resulted in the charges in the amended information.

A.     *The First Confrontation (Intersection of Evergreen & Dickens)*

On the morning of April 30, 2018, D.M. was walking his dog in his neighborhood in the Point Loma area of San Diego. At the intersection of Evergreen Street and Dickens Street, D.M. observed a LimeBike,[3] surrounded by trash bags, with its self-locking mechanism taped open.

---

[2]     "We recite the evidence in the light most favorable to the jury's verdict." (*People v. Banks* (2015) 61 Cal.4th 788, 795.)

[3]     With a citation to the website for Neutron Holdings, Inc., doing business under the name "Lime," formerly "LimeBike," Bennett tells us that a "LimeBike is a rental bicycle that is operated by people downloading the LimeBike application onto their cell phones and using the application to pay and rent out the communal bicycles." (Citing <https://www.li.me/about-us.>)

Believing that he might "thwart vandalism or maybe even a bike theft," D.M. removed the tape and pushed down a lever that locked the bike.

Almost immediately, D.M. heard Bennett, screaming at him from further down Dickens. Bennett was approaching D.M. on foot, coming up Dickens away from Rosecrans. D.M. first heard Bennett yell: " 'What are you doing with my bike?' " In an effort to deescalate the situation, D.M. started walking toward Bennett, but Bennett continued advancing to the point that he was in D.M.'s personal space, yelling, " 'If you messed with my bike, I'm going to fuck you up.' "

The situation escalated quickly, and D.M. raised his voice. Although the record is not clear as to who first pushed whom, D.M. pushed Bennett away to create space between them in an effort to avoid physical harm. Believing that the situation "was getting out of hand," D.M. asked a woman in a parking lot to call 911; and, as he turned to proceed down Dickens toward Rosecrans, Bennett punched D.M. in the back. Although the punch hurt, D.M. wanted to avoid further conflict and kept going, ultimately returning home with his dog.

At home, D.M. called a police officer friend to find out whether there was anything he could do to report the injury he received from Bennett's punch. Based on his friend's advice, D.M. determined to take a photograph of Bennett and provide it to the desk sergeant at the local office of the police department in the event others in the area report (or had reported) "trouble" with Bennett.

B.    *The Second Confrontation (Intersection of Rosecrans & Cañon)*

Approximately one to one and a half hours after returning home, D.M. drove back to the area of the earlier confrontation. He wanted to take a photograph of the LimeBike and to get its serial number to find out whether

4

it had been reported stolen.  As D.M. drove down Evergreen, he passed the intersection with Dickens (the site of the first confrontation), stopping approximately six blocks farther, at the intersection of Evergreen and Talbot. As he looked up Talbot, D.M. saw Bennett on Harbor View, just past the intersection of Harbor View and Talbot.

From what D.M. could see, Bennett now had a yellow bicycle (i.e., not the LimeBike), the bicycle had a number of trash bags full of empty cans attached, and Bennett was going through trash cans in front of a house on Harbor View.  D.M. parked his car on Evergreen and began walking up Talbot toward Harbor View so that he could take a photograph of Bennett to give to the desk sergeant at the police department's local division office. From a point at which D.M. was approximately 15 feet away from Bennett, D.M. took a photograph of Bennett.

Bennett came running down Harbor View and aggressively grabbed D.M. around his upper body and arms.  D.M. responded by swinging at Bennett and trying, unsuccessfully, to push him away.  A fight ensued, with Bennett pushing D.M. into some bushes in front of a home near the intersection of Harbor View and Talbot, whereupon D.M. lost his footing and fell.  As D.M. lay on the ground in the bushes, Bennett punched D.M. repeatedly.  Kicking, screaming, and punching, D.M. managed to stand up and get out of the bushes.  According to D.M., he was "winded," "beat up," "scratched up," and "afraid" and "just wanted to get out of there as fast as I could."

D.M. ran away from Bennett:  down Harbor View to the intersection with Talbot; right on Talbot (across Evergreen and past D.M.'s parked car[4])

---

[4]    While running as fast as he could down Talbot, D.M. did not stop at his car, because at that point Bennett was "right behind" him.

5

to the intersection with Rosecrans; and left on Rosecrans to the intersection with Cañon. As he waited for the stop light to change at the corner of Rosecrans and Cañon, D.M. saw Bennett approximately 20 feet behind him on the sidewalk on Rosecrans.

Bennett approached D.M., walking very quickly and holding two rocks the size of softballs. To escape, D.M. proceeded into cross-traffic on Cañon, a busy commercial area of Point Loma. Bennett closed the gap between the two to 10 feet, and when D.M. was a few feet off the curb, an eyewitness (H.M.) saw Bennett throw one of the rocks he was holding, like he was pitching a baseball. The rock struck Bennett in the back with such force that it knocked him down in the middle of Cañon, and he blacked out. As D.M. became aware of his surroundings, he heard cars, brakes, and screeching tires, and saw a bus swerve, narrowly missing him. Physically, D.M. lay in the street with Bennett on top of him holding a rock.

D.M. managed to get up, and he continued across both Rosecrans and Cañon, finally stopping in front of a post office on Cañon. A woman who came out of the post office called 911, and a man who saw some of the later events went to his car to get first aid supplies. D.M. thought that the attack was over; and, no longer able to stand, he kneeled down on the sidewalk in front of the post office where people had started to gather.

After a few minutes' respite, Bennett appeared from the shadows on the sidewalk adjoining Cañon in front of the post office. Again armed with two rocks, Bennett approached D.M., saying multiple times, " 'I'm going to kill you.' " D.M. believed that Bennett had the intent to carry out his threat; and, because D.M. was injured and unable to run or fight back, he was

6

scared, thinking, "I'm going to die."[5]  A bystander intervened, physically getting in between the two men and telling Bennett to " '[g]et back' " and to drop the rocks.  Bennett turned around toward Rosecrans, dropped the rocks in a planter, and walked away.

According to two eyewitnesses, at all times Bennett was the aggressor, and Bennett threatened D.M. with death as Bennett stood over D.M. in front of the post office on Cañon.

As a result of these incidents, D.M. was physically injured.  D.M. suffered a three-inch gash to his right arm that required a hospital visit and six or seven stitches, took two weeks to heal, and left a scar.  From the punching and the rock attack, D.M. suffered lacerations on his side and  "a severe softball-sized welt" where the rock struck him.  The welt turned into a contusion that lasted a month; and D.M. took pain pills for two days, during which time he missed work.  D.M. also suffered cuts to his left leg from the first confrontation during the altercation in the bushes on Harbor View, and his back and side remained bruised for at least six weeks after being struck by the rock.

## III.  DISCUSSION

On appeal, Bennett alleges five specific errors and the cumulative effect of all five.  As to all issues on appeal, we assume the judgment is correct, and, in order to obtain relief on appeal, Bennett (as the appellant) must establish both error and prejudice.  (*People v. Thompson* (2016) 1 Cal.5th 1043, 1097, fn. 11.)

As we explain, Bennett did not meet his burden of establishing reversible error.

_____

[5]    At his work, D.M. had observed border patrol agents die from being pelted with rocks.

A.      *Exclusion of Evidence to Impeach a Percipient Witness (H.M.)*

H.M. was a percipient witness to the second confrontation, and the People identified him as a prosecution witness for trial.[6] The trial court granted the People's unopposed motion in limine to exclude H.M.'s 2014 misdemeanor convictions for insurance fraud in violation of section 550, subdivisions (a)(1) & (b)(1).[7]

Bennett contends that this ruling requires a reversal of the judgment based on evidentiary error or, in the alternative, on ineffective assistance of counsel (by failing to oppose the motion to exclude the evidence of H.M.'s convictions).

1.      *Law*

We begin with the understanding that " '[e]vidence of a misdemeanor conviction, whether documentary or testimonial, is inadmissible hearsay when offered to impeach a witness's credibility.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 763, italics omitted, quoting *People v. Wheeler* (1992) 4 Cal.4th

---

[6]      At trial, H.M. testified that he owns an auto repair shop on the corner of Rosecrans and Cañon and that, on the morning of April 30, 2018, he was outside the shop and saw: A man (presumably D.M., but H.M. did not identify D.M. at trial) run north on Rosecrans with Bennett running behind the man; Bennett throw a rock, like a pitcher throwing a baseball, at the man in front of Bennett; the rock hit the lower back of the man; and the man fall to ground in the street.

[7]      Section 550 provides in part: "(a) It is unlawful to . . . [¶] (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance. [¶] . . . [¶] (b) It is unlawful to . . . [¶] (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact."

284, 300 (*Wheeler*).) An exception is that " '[p]ast criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, *subject to the court's discretion under Evidence Code section 352.*' " (*People v. Smith* (2007) 40 Cal.4th 483, 512 (*Smith*), italics added; see *Woodruff*, at p. 763.) Together, according to this rule and exception: "Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion." (*People v. Chatman* (2006) 38 Cal.4th 344, 373 (*Chatman*).)

Evidence Code section 352 provides that the trial court has the discretion to exclude otherwise admissible evidence, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a court's ruling under Evidence Code section 352 for an abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 337 [admissibility of impeachment evidence of past criminal conduct involving moral turpitude].)

The trial court's discretion here is " 'broad' " and authorizes the court to control the presentation of proposed impeachment evidence " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*Smith*, *supra*, 40 Cal.4th at pp. 512-513.) As particularly applicable here, under Evidence Code section 352, "trial courts have broad discretion to exclude impeachment evidence *other than felony convictions* where such evidence might involve undue time, confusion, or prejudice." (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24, italics added.)

9

2.	*Analysis*

Bennett first explains why violations of section 550, subdivisions (a)(1) and (b)(1), involve moral turpitude.  (See *Wheeler*, *supra*, 4 Cal.4th at p. 295 ["Misconduct involving moral turpitude may suggest a willingness to lie"].)  For purposes of this opinion, we will assume without deciding that H.M.'s convictions for violations of section 550 involved moral turpitude and determine whether, on this specific record, Bennett met his burden of establishing that the trial court abused its discretion in excluding the proposed impeachment evidence.  As we explain, he did not.

Contending that "[t]he fact that [H.M.] has the character of dishonesty could have raised a reasonable doubt as to whether H.M. actually testified truthfully," Bennett argues:  "The cross-examination of [H.M.] regarding the insurance fraud would not have taken much time, nor would it have been unduly prejudicial.  [*H.M.*] *would have simply admitted the conviction*.  This would not have confused the issue in the case or misled the jury.  Thus, the probative value of [H.M.'s] prior conviction was highly probative and not substantially outweighed by undue prejudice."  (Italics added.)  Legally, Bennett is wrong; and factually, Bennett does not explain how he might have achieved his goal.

Legally, a misdemeanor *conviction*, even one involving moral turpitude, is inadmissible for impeachment purposes.  (*Chatman*, *supra*, 38 Cal.4th at p. 373.)  Factually, the record is devoid of evidence of H.M.'s *conduct* that resulted in his 2014 misdemeanor convictions.[8]  As in *Chatman*, "we do not

---

8	In support of the motion in limine, the People told the court that the People were "unaware of the conduct" that resulted in H.M.'s 2014 misdemeanor convictions.  In his reply brief on appeal, Bennett tells us that H.M.'s 2014 misdemeanor convictions were based on "fraudulent conduct on

know what the underlying conduct was, whether or how it would have been significant, how defendant would have attempted to prove it, or whether he could have done so." (*Ibid.*) Thus, as *Chatman* explains, "this circumstance would make the claim noncognizable [on appeal]." (*Ibid.*, citing Evid. Code, § 354, subd. (a) [to preserve for appellate review the erroneous exclusion of evidence, "[t]he substance . . .. of the excluded evidence" must have been "made known to the court"].)  For this reason, Bennett forfeited appellate consideration of this argument.[9]

Bennett also forfeited appellate consideration of his argument that his trial attorney's failure to object to the People's in limine motion constitutes ineffective assistance of counsel.  As Bennett correctly explains, "[t]o prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his defense counsel's deficient performance prejudiced his defense"; and "[a] defendant shows prejudice when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (Citing and quoting *Strickland v. Washington*

---

government employment forms," but Bennett provides no record reference for this statement, and our independent review of the record has disclosed none.

[9]    Even if we reached the merits, we would not be persuaded by Bennett's suggestion on appeal that the exclusion of impeachment evidence of H.M.'s misdemeanor convictions violated Bennett's Sixth Amendment and Fourteenth Amendment rights to present a complete defense.  That is because " 'the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)  Stated more generally, " 'not every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251.)

11

(1984) 466 U.S. 668, 687, 699 (*Strickland*).) Here, however, Bennett does not attempt to explain how his trial attorney's failure to object prejudiced his defense or how, but for his trial attorney's failure to object to the People's in limine motion, the result at trial would have been different.

B.     *Exclusion of Evidence as to D.M.'s Percentage of Fault for the Incident*

In September 2018, almost five months after the confrontations in Point Loma, in a meeting with a deputy district attorney and her investigator, D.M. told them that "he fe[lt] the incident was 60% his fault."[10]

In limine, the People moved to exclude this evidence of "the percentage [of fault] in this case, as it is highly prejudicial under Evidence Code section 352 . . . ." More specifically, the People sought to "exclude the legal conclusion of '60%' at fault." The trial court granted the motion, ruling only: "The numerical figure is excluded."

During trial, the following exchange took place as D.M. was being cross-examined by Bennett's attorney:

> "[BENNETT'S ATTORNEY] Q.  Do you remember having a meeting with an investigator from the district attorney's office [in September 2018]?
>
> "[D.M.] A.   I do.
>
> "Q.    Now, in that meeting, did you inform them that you felt this was — this incident was partially your fault?
>
> "A.    *I'll tell you right now it was 50 percent.*
>
> "Q.    Without getting to a percentage.  Was it —
>
> "[THE PROSECUTOR]:  Your Honor, motion to strike.

---

10     These and the other pretrial "facts" were not presented to the trial court as evidence.  Instead, they are contained in a motion in limine to exclude certain evidence that is contained in the People's trial brief filed on the morning of the first day of trial.  Since the court and the parties accepted these "facts," so do we for purposes of this argument on appeal.

12

"THE COURT: Motion is granted pursuant to the in limine ruling. Jury is instructed to disregard the statement 'I'll tell you right now it was 50 percent.' Motion is granted.

"[BENNETT'S ATTORNEY] Q. So would you say you were partially at fault for this?

"[D.M.] A. Yes.

"[¶] . . . [¶]

"Q. And, again, you reiterated that this was partially your fault; correct?

"A. Yes.

"[¶] . . . [¶]

"Q. And that you should have minded your own business?

"A. . . . [Y]es, I should have just minded my own business." (Italics added.)

On appeal, Bennett argues that the trial court erred in excluding D.M.'s pretrial statement assessing his *percentage* of fault for "the incident."[11] More specifically, Bennett contends that "the fact that [D.M.] previously admitted to being most at fault for what happened" was not only "highly probative" but also "essential" to Bennett's claim of self-defense. The Attorney General acknowledges that D.M.'s perception of the events was relevant (as did the prosecutor in the trial court), arguing only that the court did not abuse its discretion in excluding D.M.'s opinion testimony regarding the percentage of fault he attributed to himself.

---

[11] Notably, we do not know whether, for purposes of assessing fault, D.M. considered "the incident" the entire morning's activities—i.e., both confrontations—or merely the assault, as Bennett's argument assumes without evidentiary support.

13

In a separate, independent argument, Bennett contends that his trial counsel provided ineffective assistance for two reasons: (1) counsel failed to oppose the in limine motion to exclude D.M.'s pretrial statement of his percentage of fault (60 percent); and (2) counsel failed to impeach D.M. on his prior inconsistent statement as the assessment of his percentage of fault (60 percent pretrial versus 50 percent at trial).

1. *Exclusion of Evidence under Evidence Code Section 352*

   a. *Law*

As we introduced at part III.A.1., *ante*, "under Evidence Code section 352, the trial court retains the discretion to exclude relevant evidence if 'its probative value is substantially outweighed by the probability that its admission will' either 'necessitate undue consumption of time' or 'create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Young* (2019) 7 Cal.5th 905, 931 (*Young*).) We review the court's decision to exclude evidence under Evidence Code section 352 for abuse of discretion. (*Young*, at p. 931.)

   b. *Analysis*

The issue is whether the trial court's in limine ruling to exclude evidence of D.M.'s opinion as to the percentage of fault he attributed to himself was " ' "arbitrary, capricious, or absurd" ' " and, if so, whether the ruling " ' "result[ed] in a miscarriage of justice." ' " (*Young*, *supra*, 7 Cal.5th at p. 931.)

Once again, however, by failing to object to the People's in limine motion in the trial court, Bennett forfeited appellate court consideration of potential trial court error in excluding evidence of D.M.'s opinion as to his percentage of fault in the confrontations with Bennett. (*People v. Peoples* (2016) 62 Cal.4th 718, 744 [" ' "As a condition precedent to challenging the

14

exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the 'substance, purpose, and relevance of the excluded evidence' " ' "].)  In any event, the result would be no different if we reached the merits of Bennett's argument.

On appeal, Bennett argues that *he* "was the true victim," and that the court's ruling precluded him from presenting evidence that was "essential" and "highly probative to the defense theory of self-defense."  We disagree. Even if we fully credit the evidence that D.M. "fe[lt] the incident was 60% his fault," the record lacks substantial evidence for the application of the affirmative defense of self-defense.  Stated differently, regardless of D.M.'s opinion as to his percentage of fault for "the incident," based on the uncontradicted evidence, as a matter of law, the People met "the[i]r burden of proving beyond a reasonable doubt that [Bennett] did not act in lawful self-defense."  (CALCRIM No. 3470.)  That is because the legal standard for self-defense is not met merely by the defendant's showing that the other person was the aggressor or more "at fault" than the defendant.

Consistent with CALCRIM Nos. 3470 and 3474 and without objection, the court instructed the jury as follows (italics added):

> "Self-defense is a defense to assault with a deadly weapon as charged in Count 1 . . . . The defendant is not guilty of the crime[] if he used force against the other person in lawful self-defense.
>
> *"The defendant acted in lawful self-defense if, one, the defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully; two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and, three, the defendant used no more force than was reasonably necessary to defend against that danger.*

15

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed that there was imminent danger of bodily injury to himself or imminent danger that he would be touched unlawfully. Defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use the amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in self-defense.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"[¶] . . . [¶] . . .

"If you find that [D.M.] threatened or harmed the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"A defendant[ i]s not required to retreat. A defendant is entitled to stand his ground and defend himself, and if reasonably necessary, to pursue an assailant until the danger of bodily injury or unlawful touching has passed. This is so even if safety could have been achieved by retreating.

"[¶] . . . [¶] . . .

"*The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends.*"

16

Thus, as instructed by the court, for a jury to have found "lawful self-defense," the record must contain evidence to support findings that Bennett: (1) "reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully"; *and* (2) "reasonably believed that the immediate use of force was necessary to defend against that danger"; *and* (3) "used no more force than was reasonably necessary to defend against that danger." (See instructions, *ante*, ¶ 2.) Moreover, as further instructed, the jury could not have found "lawful self-defense" where the evidence established that D.M. had "withdraw[n] or no longer appear[ed] capable of inflicting any injury." (See instructions, *ante*, last ¶.) "We presume the jury followed the trial court's instruction absent evidence to the contrary." (*People v. Fayed* (2020) 9 Cal.5th 147, 192.)

Here, as we discuss in greater detail at part III.C.2., *post*, as D.M. ran away from Bennett trying to escape, Bennett chased after D.M. for at least four city blocks (from the intersection of Harbor View and Talbot to the intersection of Rosecrans and Cañon), even after D.M. had gotten far enough ahead to have lost sight of Bennett; and Bennett threw a rock at D.M. as D.M. was running away, striking him in the back. Given this uncontradicted evidence that *Bennett was chasing D.M., who was running away*, as a matter of law, "lawful self-defense" cannot apply regardless of evidence of D.M.'s "feel[ing]" as to the percentage of his fault for the incident. First, the record contains no evidence to support one, let alone all three, of the required findings necessary for a jury to have found "lawful self-defense": Bennett could not have reasonably believed either that he was in imminent danger of bodily injury or that immediate use of force was necessary to defend against such danger; and, because there was no such danger, there is no amount of force that was necessary for Bennett to reasonably defend against. Moreover,

17

the record contains uncontradicted evidence that, at the time of the assault, D.M. had withdrawn and was unable to inflict injury. After all, " '[w]hen the danger has passed and the attacker has withdrawn, there can be no justification for the use of further force.' " (*People v. Smith* (1981) 122 Cal.App.3d 581, 590 [assault with a deadly weapon].)

For these reasons, D.M.'s assessment of percentages of fault for the incident was, contrary to Bennett's argument on appeal, neither "essential" nor "highly probative to the defense theory of self-defense."[12] Thus, Bennett did not meet his burden on appeal of establishing that, in excluding D.M.'s opinion of his specific percentage of fault, the trial court's ruling was arbitrary, capricious, or absurd, resulting in a miscarriage of justice.

 2. *Ineffective Assistance of Counsel*

  a. *Law*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215, citing *Strickland, supra*, 466 U.S. at p. 684.) This right entitles the defendant "not to some bare assistance but rather to *effective* assistance." (*Ledesma*, at p. 215; accord, *Strickland*, at p. 686.)

To succeed on a claim of ineffective assistance of trial counsel, an aggrieved defendant like Bennett "must show *both* that his counsel's

---

12 In his reply brief on appeal, Bennett suggests that "if the trial court was bothered by the numerical estimate, all it had to do is instruct [D.M.] to say outside the presence of the jury, 'please don't speak in percentages. Tell the jury that you believe you were mostly at fault and leave it at that.' " Bennett forfeited consideration of this argument, since he raises it for the first time in his reply brief on appeal. (*People v. Tully* (2012) 54 Cal.4th 952, 1075 (*Tully*) ["arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"].)

18

performance was deficient when measured against the standard of a reasonably competent attorney *and* that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366, italics added, quoting *Strickland, supra*, 466 U.S. at p. 686.)

With regard to prejudice, the defendant must show "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676 (*Centeno*), quoting *Strickland*, at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694.)

If the defendant is unable to establish *both* deficient performance *and* prejudice, " 'we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' " (*Centeno, supra*, 60 Cal.4th at pp. 674-675.)

b.  *Analysis*

Based on D.M.'s pretrial statement to the district attorney's office that he "feels the incident was 60% his fault," Bennett argues that his trial attorney was ineffective on two separate grounds:  (1) counsel failed to oppose the People's in limine motion to exclude D.M.'s pretrial statement of his percentage of fault (60 percent); and (2) counsel failed to impeach D.M. with his prior inconsistent statement, once he testified at trial that the incident was 50 percent his fault.

With regard to Bennett's counsel's failure to oppose the motion to exclude D.M.'s pretrial statement of his percentage of fault for the incident,

Bennett cannot establish either counsel's deficient performance or the requisite prejudice. That is because, on cross-examination, in response to a question from Bennett's attorney, D.M. expressly testified that, in his opinion, the incident "was 50 percent" his fault. Thus, counsel's failure to oppose the in limine motion to exclude D.M.'s opinion as to his "percentage of fault" did not adversely affect counsel's ability to obtain D.M.'s opinion testimony that the incident was 50 percent his fault.[13] The fact that the prosecutor objected and the court struck D.M.'s testimony raises different issues, but those issues do not affect the fact that, at trial, D.M. did provide opinion testimony as to his "percentage of fault."

With regard to Bennett's counsel's failure to impeach D.M. on cross-examination, Bennett argues that his trial attorney's performance was deficient, because: During trial, D.M. testified that he felt he was 50 percent at fault; prior to trial, D.M. told the district attorney's office that he felt he was 60 percent at fault; yet, at trial, counsel failed to impeach D.M. based on his prior inconsistent statement. The problem with Bennett's argument is that the record does not support the premise for his syllogism. Because the court struck D.M.'s trial testimony that he felt 50 percent at fault, there is no—and cannot be—a *prior inconsistent* statement.

C.  *Sufficiency of the Evidence to Support Bennett's Conviction for Making a Criminal Threat (§ 422)*

Specially finding that Bennett said to D.M., " 'I'm going to kill you,' " the jury convicted Bennett of having made a criminal threat in violation of

---

13    Likewise, counsel's failure to object to the in limine motion did not affect counsel's ability to ask D.M. whether he ever believed that he was more to blame for the incident than Bennett. The motion was directed to, and the court's ruling was limited to, excluding only evidence of D.M.'s " '*percentage of fault.*' " (Italics added; capitalization omitted.)

section 422.  On appeal, Bennett argues that the record does not contain substantial evidence to support the conviction.

    1.    *Law*

        a.    *Making a Criminal Threat*

Our Supreme Court has explained that, because "not all threats are criminal," to establish the offense of making a criminal threat under section 422, subdivision (a),[14] the People must prove:

> " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety . . . ," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*), quoting *People v. Toledo* (2001) 26 Cal.4th 221, 227-228 [(*Toledo*)], quoting former § 422; accord, *People v. Chandler* (2014) 60 Cal.4th 508, 511 (*Chandler*).)

---

[14]    Section 422, subdivision (a) provides in relevant part:  "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . , shall be punished by imprisonment . . . ."

Contrary to Bennett's presentation on appeal, "*all of the surrounding circumstances* should be taken into account to determine if a threat falls within the proscription of section 422." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013, italics added.)

### b. *Substantial Evidence Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 990.)  In doing so, we " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' "  (*Ibid.*)

" 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)  " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)  In fact, "the testimony of a single witness is sufficient to support a conviction," unless such testimony describes facts or events that are "physically impossible or inherently improbable." (*Ibid.*; see Evid. Code, § 411.)  Where " 'the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Covarrubias*, at p. 890.)  We consider only the evidence or inferences from evidence "in support of the verdict," not

in support of a challenge to the verdict. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 37 (*Veamatahau*); accord, *People v. Ghipriel* (2016) 1 Cal.App.5th 828, 832 (*Ghipriel*) [" 'It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion.' "].)

In short, we may not reverse a judgment for insufficient evidence " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

2.     *Analysis*

Bennett contends that the record lacks substantial evidence to support two necessary findings required for a violation of section 422, subdivision (a): (1) Bennett's threat was not unconditional and immediate;[15] and (2) D.M. was not reasonably placed in sustained fear. As we explain, Bennett did not meet his burden as to either implied finding of the jury.

a.     *Bennett's Threat Was Immediate and Unconditional*

Bennett argues that the record contains insufficient evidence to support the jury's implied finding that Bennett's statements to D.M. were sufficiently "immediate and unconditional" to support a violation of section 422, subdivision (a). (Bolding omitted.) More specifically, Bennett contends: "No witness testified that [Bennett] pushed, shoved, or became physical with [D.M.] when he made the alleged criminal threat"; and, because

---

[15]     In a point heading, Bennett contends that the threat was not "*Unequivocal*, Unconditional, and Immediate." (Italics added, bolding omitted.) However, because Bennett presents no argument that the threat was not unequivocal, we deem the argument abandoned. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*); see Cal. Rules of Court, rule 8.204(a)(1)(B).)

Bennett dropped the rocks and walked away at the end of the second confrontation, "there was no evidence to suggest that [Bennett] did anything to follow up on the statements."

Contrary to Bennett's appellate argument, " '[t]o constitute a criminal threat, a communication need not be *absolutely* unequivocal, unconditional, immediate, and specific.' " (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433 (*Hamlin*).) In *People v. Bolin* (1998) 18 Cal.4th 297, for example, our Supreme Court held that "prosecution under section 422 does not require an *unconditional* threat of death or great bodily injury." (*Bolin*, at p. 338, italics added.) That is because " 'there are different degrees of unconditionality. A threat which may appear conditional on its face can be unconditional under the circumstances.' " (*Id*. at p. 340.) For this reason, " 'the test is whether, in light of the surrounding circumstances, the communication was *sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution.' " (*Hamlin*, at p. 1433.) The "immediacy" and "unconditionality" of the threat—i.e., the implied findings for which Bennett contends the record lacks substantial evidence—"are 'simply [*some of*] the factors to be considered in determining whether a threat, *considered together with its surrounding circumstances*, conveys those impressions to the victim.' " (*People v. Wilson* (2010) 186 Cal.App.4th 789, 807; accord, *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 (*Mendoza*) [determination of whether the words conveyed a threat is "based on *all the surrounding circumstances* and not just on the words alone" (italics added)].)

Likewise, contrary to Bennett's appellate argument, a lack of evidence that Bennett "follow[ed] up on the statements" he made to D.M. is irrelevant to our consideration. For purposes of section 422, subdivision (a), a threat is

24

not insufficient " 'simply because it does "not communicate a time or precise manner of execution" ' "; to the contrary, a threat is sufficient merely " 'where it threatens death or great bodily injury.' " (*People v. Wilson, supra*, 186 Cal.App.4th at p. 809; accord, *In re David L.* (1991) 234 Cal.App.3d 1655, 1660 [§ 422 does not require the showing of an immediate ability to carry out the stated threat].) Indeed, convictions for making a criminal threat have been upheld where the victim is aware that the defendant is physically unable to presently act on the threat. (E.g., *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431 (*Gaut*) [the defendant was incarcerated]; *People v. Smith* (2009) 178 Cal.App.4th 475, 479 [the defendant was in Texas without a job or income, and the victim was in California].)

In short, although evidence that the defendant physically assaulted the victim or that the defendant commenced the threatened action against the victim will *support* a jury's finding of making a criminal threat, section 422, subdivision (a) does not *require* a showing of physical assault or taking action on the threat to establish a violation. Thus, a lack of evidence of a physical assault or action on the threat does not support Bennett's claim that the record lacks substantial evidence to support his conviction of violating section 422, subdivision (a).

In considering all the surrounding circumstances,[16] we have no difficulty concluding that substantial evidence supports the jury's implied

---

[16] Since we do not reweigh evidence (*Covarrubias, supra*, 1 Cal.5th at p. 890), we do not consider *all* the surrounding circumstances; we consider only those surrounding circumstances that *support* the judgment (*ibid*.) and determine whether those circumstances support a finding that the threat was sufficiently immediate and unconditional to convey to D.M. "a gravity of purpose and immediate prospect of execution" (*Hamlin, supra*, 170 Cal.App.4th at p. 1433).

Whereas Bennett has improperly limited his presentation to evidence

25

finding that, for purposes of a violation of section 422, subdivision (a), Bennett's threat—*viz.*, that he told D.M. "I'm going to kill you"[17]—was immediate and unconditional. Within a matter of a few hours on the morning of April 30, 2018: Bennett charged at D.M. on Dickens, advancing into his personal space, yelling, " 'If you messed with my bike, I'm going to fuck you up' "; as D.M. retreated, Bennett punched him in the back, hurting him; Bennett ran down Harbor View, aggressively grabbing D.M. around his upper body and arms and pushing him into some bushes; D.M. fell to the ground, and Bennett punched D.M. repeatedly; once he escaped, D.M. ran away, "winded," "beat up," "scratched up," *and "afraid"* (italics added); Bennett chased D.M. for many blocks, catching up to him on Rosecrans; Bennett approached quickly, holding two large rocks the size of softballs; like he was pitching a baseball, Bennett threw one of the rocks at D.M., striking him in the back; the force of the impact knocked D.M. down in the middle of a busy city street, causing him to lose consciousness as he ran into oncoming traffic; laying in the street, D.M. heard cars, brakes, and screeching tires, and he saw a bus swerve, narrowly missing him; meanwhile, holding a rock, Bennett got on top of him; D.M. again managed to escape, crossing the street,

from the second confrontation (at the intersection of Rosecrans and Cañon, where Bennett communicated the threat), we consider the entire morning's events—including the first confrontation (at the intersection of Evergreen and Dickens). (*People v. Wilson, supra*, 186 Cal.App.4th at p. 809 [the "surrounding circumstances" include "how [the defendant] acted before . . . the threat"], 812 ["the nature of the defendant's threats had to be viewed based on his history of . . . violence against the victim" (citing *Gaut, supra*, 95 Cal.App.4th at p. 1431)]; *Mendoza, supra*, 59 Cal.App.4th at p. 1340 ["The parties' history can also be considered as one of the relevant circumstances"].)

17 We do not consider Bennett's arguments that evidence of *other* threats was insufficient to support the conviction, since the jury specially found that Bennett threatened, " 'I'm going to kill you.' "

at which time he kneeled on the sidewalk by the post office, no longer able to stand due to exhaustion; minutes later, Bennett appeared from the shadows on the sidewalk; again armed with two rocks, Bennett approached D.M., saying multiple times, " 'I'm going to kill you' "; and as a result of this ordeal, D.M. suffered a three-inch gash to his right arm (that required a hospital visit and stitches and left a scar), a contusion to his lower back, lacerations on his side, cuts to his left leg, and bruises to his side and back. Significantly, D.M. believed that Bennett had the intent to carry out his threat; and, D.M. was scared and afraid, thinking, "I'm going to die."

Having presented no argument that the foregoing evidence does not substantiate the jury's implied finding that the threat was immediate and unconditional, Bennett did not meet his burden of establishing a lack of substantial evidence to support the conviction for making a criminal threat under section 422, subdivision (a).

b.     *D.M. Was Reasonably Placed in Sustained Fear*

Bennett next argues that the record contains insufficient evidence to support the jury's implied finding that his statements to D.M. reasonably placed him in sustained fear. Bennett emphasizes that a "victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (Citing *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140 (*Ricky T.*).) Determination of sustained fear is subjective, whereas determination of reasonableness is objective. (*Ibid.*)

Based on the evidence we summarized at the close of the immediately preceding part of this opinion, we have no difficulty concluding that substantial evidence supports the finding that D.M. reasonably believed he was in sustained fear for his life. Notably, Bennett again does not present a substantial evidence analysis. This time he relies on *other evidence*, which he

27

contends is more persuasive,[18] arguing that this *other evidence* does not support the finding of a reasonable belief of sustained fear. However, in our substantial evidence review, we do not reweigh evidence (*Covarrubias, supra,* 1 Cal.5th at p. 890), and we consider only those surrounding circumstances that *support* the judgment (*Veamatahau, supra,* 9 Cal.5th at p. 37; *Ghipriel, supra,* 1 Cal.App.5th at p. 838) before determining, as we have, whether those circumstances support the finding that Bennett's threats reasonably placed D.M. in sustained fear (see *Ricky T., supra,* 87 Cal.App.4th at p. 1140).

D.  *Sufficiency of the Evidence to Support the Finding that Bennett Used a Dangerous or Deadly Weapon During the Commission of the Criminal Threat (§ 12022, Subd. (b)(1))*

The jury found true the allegation that, in making the criminal threat in violation of section 422, Bennett "personally used a deadly and dangerous weapon, to wit: [a] rock," within the meaning of section 12022, subdivision (b)(1). On appeal, Bennett argues that the record does not contain sufficient evidence to support the jury's true finding on the enhancement allegation. More specifically, Bennett contends that there is no evidence that he "used the rock in a menacing manner."

1.  *Law*

Section 12022, subdivision (b)(1) provides in full: "A person who personally uses a deadly or dangerous weapon in the commission of a felony

18    Bennett suggests that, since D.M. got up from his kneeling position (on the sidewalk in front of the post office) and approached Bennett after Bennett's threat, D.M. was not in fear of his life. Bennett also suggests that, since he took his rocks and walked away from D.M. at a time when others were tending to D.M., D.M.'s fear of death was only "momentary or fleeting." Even if we were to consider this evidence (which we do not, as we explain in the text, *post*), these suggestions require inferences from the evidence to which Bennett, as the appellant, is not entitled. (*Veamatahau, supra,* 9 Cal.5th at p. 37; *Ghipriel, supra,* 1 Cal.App.5th at p. 838)

or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." In order to find "true" a section 12022, subdivision (b) allegation, " ' "a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an instrument capable of inflicting great bodily injury or death." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 630 (*Beck and Cruz*).)

In determining whether the record contains substantial evidence of deadly and dangerous *use* of a weapon, " ' "[u]se" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." ' " (*Beck and Cruz, supra*, 8 Cal.5th at p. 630.) Because the " 'obvious legislative intent' " in enacting section 12022, subdivision (b), was " 'to deter *the use*' of deadly and dangerous weapons in the commission or attempted commission of a felony," the *use* of a weapon in this context must be " 'broadly construed.' " (*Beck and Cruz*, at p. 630.)

" ' "We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction." ' " (*Beck and Cruz, supra*, 8 Cal.5th at p. 626.) For this reason, we incorporate by reference part III.C.1.b., *ante*, and proceed to determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [enhancement] beyond a reasonable doubt." ' " (*Ibid*.)

2.    *Analysis*

The issue, according to Bennett, is whether, consistent with the jury instruction,[19] the record contains substantial evidence that Bennett "*used the rock in a menacing manner.*"  (Italics added.)

Bennett relies on certain evidence, including testimony from D.M., that, at the time Bennett threatened to kill D.M., Bennett held the rocks at his side and made no effort to throw either one.  That said, Bennett also acknowledges that one witness testified that, as Bennett held the rocks in his hands, he "was 'leaning in' " toward D.M.  As we explain, without providing any legal authority for his position, Bennett too narrowly construes the

---

[19]    With regard to the section 12022, subdivision (b)(1) enhancement allegation, consistent with CALCRIM No. 3145 and without objection, the trial court instructed the jury in part as follows (italics added):

"[Y]ou must . . . decide whether . . . the People have proved the additional allegation that the defendant personally used a deadly or dangerous weapon during the commission of th[e] crime. . . .

"A deadly or dangerous weapon is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

"In deciding whether an object is a deadly weapon, *consider all the surrounding circumstances*, including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose.

"Once again, great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

"Someone personally uses a deadly or dangerous weapon if he or she intentionally, one, *displays the weapon in a menacing manner*; or, two, hits someone with a weapon.

"The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find the allegation has not been proved."

30

meaning of Bennett's *use* of the rocks in his hands at the time he threatened D.M.

In *People v. Wilson* (2008) 44 Cal.4th 758 (*Wilson*),[20] our Supreme Court instructed that, in considering whether a weapon was "used" in the commission of a crime for purposes of a weapon's enhancement, we do not limit ourselves to the specific moment in time at which the underlying crime was committed. (*Id*. at p. 807.) A defendant's "use" of the weapon need not have been strictly contemporaneous with the underlying felony; nor must the defendant have continually displayed the weapon during the course of the offense. (*Id*. at pp. 806-808.) Rather, " 'when a defendant deliberately shows a [weapon], or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. The defense may freely urge the jury not to draw such an inference,

_____

[20] The enhancement statute at issue in *Wilson*, section 12022.5, subdivision (a), deals with the use of "a firearm"—as opposed to "a deadly or dangerous weapon" as in the present case—during the commission of any of the specified felonies. (*Wilson*, *supra*, 44 Cal.4th at p. 807.) Nonetheless, as we explain, for our purposes of reviewing section 12022, subdivision (b)(1), we rely on authorities interpreting section 12022.5, subdivision (a).

Section 12022.5, subdivision (a) provides in relevant part: "[A]ny person who personally uses *a firearm* in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison *for 3, 4, or 10 years*, unless use of *a firearm* is an element of that offense." (Italics added.) Thus, the only differences between section 12022.5, subdivision (a) (the enhancement at issue in *Wilson*) and section 12022, subdivision (b)(1) (the enhancement at issue here) are the punishments, depending on the weapon used. As our Supreme Court has explained: "[S]ection 12022 would be applicable in any case in which 12022.5 applies. Basically 12022.5 is a limited application of section 12022 with a heavier penalty." (*People v. Strickland* (1974) 11 Cal.3d 946, 961.)

but a failure to actually [raise the weapon], or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022[, subdivision (b)(1)]." (*Wilson*, at p. 807.) " 'Although the use of a [deadly or dangerous weapon] connotes something more than a bare potential for use, there need not be conduct which actually produces harm but *only conduct which produces a fear of harm or force by means or display of a* [*deadly or dangerous weapon*] *in aiding the commission of one of the specified felonies.*" (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007 (*Masbruch*) [under former § 12022.3, subd. (a), which required a sentencing enhancement "if the person *uses* a firearm or any other deadly weapon *in the commission of*" specified felonies].)

In considering whether Bennett used "a deadly or dangerous weapon in the commission of" making a criminal threat, we rely on an apt analogy from our Supreme Court: " '[T]he jury may consider a "video" of the entire encounter; it is not limited to a "snapshot" of the moments immediately preceding a [criminal threat] offense. Thus, a jury could reasonably conclude that although [Bennett's] presence with [D.M.] was sporadic, the control and fear created by his initial [rocks] display continued throughout the encounter.' " (*Wilson, supra*, 44 Cal.4th at p. 807, quoting *Masbruch, supra*, 13 Cal.4th at p. 1011.)

Thus, based on the instruction that the jury "consider all the surrounding circumstances, including when and where the [rock] was possessed and any other evidence that indicates whether the [rock] would be used for a dangerous rather than a harmless purpose" (see fn. 19, *ante* ), the jury properly took into account *the entire second confrontation*—i.e., not, as argued by Bennett on appeal, solely the moment at which Bennett threatened D.M. in front of the post office. At a minimum, the following substantial

evidence supports the jury's finding that Bennett used a dangerous or deadly weapon during the commission of the criminal threat: Immediately preceding the threat, Bennett chased D.M. for many blocks, holding two large rocks the size of softballs; as D.M. attempted to escape, Bennett threw one of the rocks, like he was pitching a baseball, striking D.M. in the back; the force of the impact knocked D.M. down in the middle of a busy city street, causing him to black out as he ran into oncoming traffic; when D.M. regained consciousness, Bennett was on top of him holding a rock; and, after again escaping from Bennett's control and thinking the attack was over, D.M. kneeled down in front of the post office to catch his breath, only to have Bennett appear from the shadows on the sidewalk and approach D.M.—*once more armed with two rocks*—saying to D.M. multiple times, " 'I'm going to kill you.' "

Having presented no argument that the foregoing evidence does not substantiate the jury's finding that Bennett used a dangerous or deadly weapon during the commission of the criminal threat, Bennett did not meet his burden of establishing a lack of substantial evidence to support the sentencing enhancement under section 12022, subdivision (b)(1).

E.    *Failure to Instruct on the Lesser Included Offense of Attempt to Make a Criminal Threat*

Bennett argues that the trial court prejudicially erred in not sua sponte instructing the jury on *attempted* criminal threat under section 664,[21] as a

---

[21]    As potentially applicable here, section 664, subdivision (a) provides: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished . . . [¶] . . . by imprisonment in the state prison or in a county jail . . . for one-half the term of imprisonment prescribed upon a conviction of the offense attempted. . . ."

lesser included crime of making a criminal threat in violation of section 422, subdivision (a).

1. *Law*

Because "*every*" lesser included offense that is supported by substantial evidence "must" be presented to the jury, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 155, 162 (*Breverman*); accord, *People v. Souza* (2012) 54 Cal.4th 90, 114 (*Souza*).) This sua sponte responsibility arises regardless of the wishes of trial counsel or the parties, whenever substantial evidence supports the lesser charge. (*Breverman*, at pp. 158, 162; *Souza*, at pp. 114, 115-116.) In this context, substantial evidence means " ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Breverman,* at p. 162; *Souza*, at p. 116.) In determining the substantiality of evidence, a trial court is to consider only the "legal sufficiency" of the evidence, not its weight or the credibility of the witnesses who presented the evidence. (*Breverman*, at p. 177.)

Attempted criminal threats is a lesser included offense of criminal threats. (*Toledo, supra,* 26 Cal.4th at p. 231.) In *Toledo*, our high court described some of the potential circumstances that might fall within the reach of the offense of attempted criminal threat. As particularly applicable here, "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear,

34

the defendant properly may be found to have committed the offense of attempted criminal threat." (*Ibid.*) That is because "only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Ibid.*)

On appeal, we independently review whether the trial court erred in failing to instruct on a lesser included offense. (*Souza, supra,* 54 Cal.4th at p. 113; *People v. Waidla* (2000) 22 Cal.4th 690, 739.)

2.    *Analysis*

An instruction for a lesser included offense is required " 'when the evidence raises a question as to whether all of the elements of the charged offense were present . . . , but not when there is no evidence that the offense was less than that charged.' " (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.) Here, Bennett argues that, although D.M. *claimed* he was in fear for his life, if the jury had disbelieved D.M.'s testimony, the record contains substantial evidence to support a finding that Bennett's threats did not place D.M. in reasonable, "sustained fear for his . . . safety" as required for a conviction of making a criminal threat (§ 422, subd. (a)). In such a case, Bennett's argument continues, the jury could have convicted Bennett of an attempted criminal threat (§ 664, subd. (a)).

As we introduced *ante,* one of the elements of the offense of a criminal threat is that the defendant's threat "causes [the victim] *reasonably* to be in *sustained* fear for his or her own safety." (§ 422, subd. (a), italics added; see *Chandler, supra,* 60 Cal.4th at p. 511; *George T., supra,* 33 Cal.4th at p. 630; *Toledo, supra,* 26 Cal.4th at pp. 227-228; *Ricky T.*, *supra,* 87 Cal.App.4th at p. 1140.) " 'Sustained fear' refers to a state of mind" (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349); and under section 422, subdivision (a), for fear to be "sustained," the fear must last for "a period of

time that extends beyond what is momentary, fleeting, or transitory" (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156; see CALJIC No. 9.94; CALCRIM No. 1300).

In support of his argument, in his opening brief Bennett does not tell us for how long he contends D.M. was in fear for his life—stating only, without discussion or a record reference, that "his fear was not sustained, was only transitory, and also unreasonable given the circumstances."[22] Because Bennett's argument requires an evidence-specific inquiry, without a discussion of the specific evidence and its relation to the legal standard, Bennett has forfeited appellate review of the issue. (*Stanley*, *supra*, 10 Cal.4th at p. 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "]; see Cal. Rules of Court, rule 8.204(a)(1)(B).)

In his reply brief Bennett tells us: "[D.M.], himself, only saw [Bennett] hold the rocks in his hand, and according to him, he did not act like he was going to throw them. (4 [R]T 582-583.) None of the other witnesses saw appellant throw rocks at [D.M.] (AOB p[p.] 20-21.)"[23] However, on appeal,

---

[22]     Following that statement is Bennett's citation to "(Argument 1, *ante*.)." However, in his brief, which contains more than 30 separately-titled point headings, Bennett does not have an "Argument 1." Additionally, the brief's "first" argument deals with the trial court's exclusion of evidence of H.M.'s 2014 misdemeanor convictions for purposes of impeaching H.M. and has nothing to do with whether D.M. was reasonably in sustained fear for his safety.

[23]     Bennett's reply argument continues: "[D.M.'s] actions of pursuing [Bennett] and taking photographs of him at a close distance belie any claim of lasting fear of [Bennett]. And [D.M.] admitted to the defense investigator that he had the most fault in this incident." However, neither of those

"arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party" (*Tully*, *supra*, 54 Cal.4th at p. 1075)—especially where, as here, they are fact- or evidence-based.

For the foregoing reasons, Bennett did not meet his burden of establishing that the trial court erred in failing to sua sponte instruct the jury on the lesser included crime of attempted criminal attempt.

In any event, even if we assume that Bennett timely supplied record-supported evidence to establish an entitlement to an instruction on attempted criminal attempt, Bennett still did not meet his burden of establishing reversible error.

Reversal is required only if the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 to determine whether the failure to instruct on the lesser included offense resulted in a miscarriage of justice requiring reversal. (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *Breverman, supra,* 19 Cal.4th at p. 178.) Under this standard, such error requires reversal only when there is a reasonable probability that the defendant would have received a more favorable result had the instruction for the lesser included offense been given. (*Breverman,* at pp. 149, 178; *Watson,* at p. 836.) For purposes of this analysis, a "reasonable probability" is one sufficient to

---

statements arguably helps Bennett: The fact that D.M. did not experience sustained fear when he instigated the second confrontation is irrelevant to whether he experienced sustained fear after having been chased, hit by a rock, knocked unconscious, and had his life threatened by Bennett; and Bennett provides no record reference for the second statement, we know of no evidence of D.M.'s admission to a *defense* investigator, and the jury was not told that D.M. ever said he "had the most fault for this incident."

undermine the confidence in the conviction.[24] (*Strickland, supra,* 466 U.S. at p. 694.) "Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman,* at p. 177.) In this context, we may consider the relative strength of the evidence in support of the judgment compared to the relative weakness of the evidence in support of a different outcome. (*Ibid.*) The appellant bears the burden of establishing prejudice. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

Here, the entirety of Bennett's substantive argument is: "The failure to instruct on the L[esser ]I[ncluded ]O[ffense] for Count 2 to [*sic*] was highly prejudicial and a more favorable result would have been reached had the trial court properly provided the instruction." Accordingly, Bennett did not meet his burden of establishing prejudice.[25]

F.     *Cumulative Error*

Bennett argues that cumulative error deprived him of his Fifth, Sixth, and Fourteenth Amendment right to a fair trial and due process. As in *People v. Duong* (2020) 10 Cal.5th 36, " '[w]e have found no error, and where we assumed error, we have found no prejudice.' " (*Id.* at p. 75.) Thus, given

---

[24]     In his attempt to establish a miscarriage of justice, Bennett argues that "it is quite possible that the jury, having disdain for [Bennett's] actions, convicted him of the only offense which they were asked to consider." However, "quite possible" that the conviction is erroneous is not the same as "undermin[ing] confidence in the conviction"; and for that reason, we reject the standard Bennett contends was met here.

[25]     Had we reached the merits of a prejudice argument, in considering the relative strength of the evidence in support of the judgment and in support of a different outcome under *Breverman, supra,* 19 Cal.4th at page 177, we easily would have concluded that the evidence in support of Bennett's conviction of making a criminal threat was strong.

the record in this appeal and the rulings in this opinion, as in *Duong*, " '[n]or do we discern cumulative prejudice.' " (*Ibid.*)

## IV.  DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.